**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**BROWARD DIVISION**

CASE NO.: 12-CV-61891-WJZ

DENISE RICHARDSON,

      Plaintiff,

v.

LIFELOCK, INC., and
TODD DAVIS,

      Defendants.

_____/

**AMENDED COMPLAINT**

The Plaintiff, DENISE RICHARDSON ("DR") sues the Defendants, LIFELOCK,

INC., ("LIFELOCK"), and TODD DAVIS, ("TD") and states as follows:

**Nature Of The Action**

1.    This action is brought under the Employee Retirement Income Security

Act ("ERISA") and the Fair Labor Standards Act ("FLSA") to obtain and to remedy

denial of ERISA retirement and welfare benefits, to provide a remedy for LIFELOCK

and TD's retaliation in response to DR's request for benefits under ERISA plans as an

employee, and to remedy other ERISA violations committed by LIFELOCK against DR,

an eligible employee of LIFELOCK and employee of TD, because DR has been

misclassified as an independent contractor of LIFELOCK and of TD, and to recover

unpaid overtime wages, benefits and liquidated damages for LIFELOCK's violations of

the FLSA.  This action also contains Florida common law claims of fraud, breach of

contract and unjust enrichment seeking additional damages including punitive damages

for fraud.

**Jurisdiction And Venue**

2.      This Court has jurisdiction pursuant to ERISA, 29 U.S.C. §§ 1104, 1105, 1132(e)(1), and pursuant to 28 U.S.C. § 1331.

3.      This Court has personal jurisdiction over the defendant, LIFELOCK, because it regularly transacts business in and has significant and continuous contact with Florida including having employees located in Florida.  TD is the CEO of LIFELOCK and has also regularly transacted business and hired employees in the State of Florida.

4.      This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367(a).

5.      Venue is proper in this district under ERISA, 29 U.S.C. §1132(e)(2) and 28 U.S.C. § 1391, because the defendant's welfare and benefit plans apply to employees in this district, breaches took place in this district, defendants do business in this district and plaintiff resides and does business in this district.

**The Parties**

6.      Plaintiff, DR, is a citizen and resident of Broward County, Florida.  DR was an employee of LIFELOCK from January 1, 2008 through February 2012, although she was misclassified by LIFELOCK as an independent contractor.  At all relevant times, DR was an "employee" of LIFELOCK within the meaning of 29 U.S.C. § 203(e)(1), and under the applicable Federal and State of Florida common-law definitions.

7.      Defendant, LIFELOCK, is a corporation incorporated under the laws of the State of Delaware.  LIFELOCK is a national corporation and does business throughout the United States, including the State of Florida.  LIFELOCK has employees in multiple states, including, but not limited to, the State of Florida.  At all relevant times,

2

LIFELOCK was, and continues to be, engaged in interstate commerce as defined by the FLSA, 29 U.S.C. § 203. At all times material, LIFELOCK was the "employer" of DR within the meaning of FLSA, 29 U.S.C. § 203(d) and ERISA, 29 U.S.C. §1002(5).

8.      Defendant, TD, is the C.E.O. of LIFELOCK and under information and belief, resides in the State of Arizona.  TD, as LIFELOCK's C.E.O., is engaged in interstate commerce, does business in many states including the State of Florida and was at all times material, an employer of DR as defined by ERISA, 29 U.S.C. § 1002(5)..

9.      Defendants, LIFELOCK and TD, in combination, are collectively referred to as "DEFENDANTS"

## Factual Allegations

10.      DEFENDANTS are in the business of fraud prevention and identity theft protection services and operate nationwide. DEFENDANTS are actively engaged in interstate commerce based on the services that they provide to consumers.

11.      The services provided by DR to and/or on behalf of DEFENDANTS also qualify as interstate commerce.

12.      DR began working with DEFENDANTS in June 2006 under a general oral employment agreement.

13.      In 2007, DR continued working with DEFENDANTS and was paid $6,000.00 for her services which included mostly blogging efforts, media interviews, marketing and business development.  See Exhibit "A". Toward the end of 2007, DR approached DEFENDANTS seeking a full time position.  DEFENDANTS agreed and hired DR soon after.

14.     DR became an "employee" of LIFELOCK on or about January 1, 2008, when she entered into a one page employment agreement with LIFELOCK for a one year term.  Pursuant to the agreement, she was paid $3,000 per month for the one year term. See Exhibit "B".

15.     DR provided continuous services during her multi-year employment history with LIFELOCK in the areas of media relations, consumer education, victim education, public image development, speaking engagements, blog development, creative ideas that they applied to their offerings, advocacy development, event planning, educational events, marketing, consumer insight and other services under the direction of DEFENDANTS.

16.     In early 2008, DEFENDANTS began to make promises and representations to DR regarding her status at LIFELOCK, her future with LIFELOCK, her entitlement to future benefits and other representations related to LIFELOCK's trustworthiness and the trust which DR should have in LIFELOCK based on their long term relationship and on LIFELOCK's "do what's right" motto.

17.     Each and every promise, representation and explanation from DEFENDANTS was fully relied upon by DR when she agreed to accept the salary, work, travel, direction, control and exclusivity requirements as well as contracts presented yearly by LIFELOCK.

18.     The representations and promises made by DEFENDANTS include, but are not limited to the following:

      a.  LIFELOCK promised that once it was in a better financial position, DR would begin receiving benefits that other employees received, including stock options, health care and retirement accounts;

4

b.  LIFELOCK promised that if DR stayed with LIFELOCK through their "tough times" with regulatory problems and lawsuits that she would be rewarded in the future with better compensation packages;

c.  LIFELOCK represented to DR on many occasions that she was a valued employee of LIFELOCK and that she was getting in on the ground floor with LIFELOCK and would be with them for the long run;

d.  LIFELOCK represented to DR that it was a company founded on the ideal of "doing the right thing" by their members and employees including DR;

e.  LIFELOCK consistently promised DR that LIFELOCK was a trustworthy business that was misunderstood, made mistakes, besieged by competitors but they would always do what was right and what was necessary to land on top, and that she should have trust and faith in them;

f.  When DR received a renewal contract for the calendar year of 2010 during the holidays in late 2009, suddenly the normal one page Agreement  was a multi-page contract and when she questioned or objected to terms in the contract, and the lateness of delivery not allowing her time to have a lawyer review, LIFELOCK responded, "[we] would hope that after so much time with LifeLock you would believe in us and understand that this contract is simply what is required by our Legal Team and that we would NEVER do anything to adversely affect our relationship with you". LIFELOCK through Director of Public Affairs, Tami Nealy, stated, "Your 2010 contract is with Legal. They are finalizing with their technical terms – not any issues that you or I need to be concerned with." <u>See</u> Exhibits "C" and "D".

g.  A similar situation occurred just prior to the 2011 renewal in which DR
was asked to trust LIFELOCK as they continued to insert unilateral
provisions in its contracts to the detriment of its employees, including DR.

19.     The promises made by LIFELOCK were made with the intention of
building DR's trust and confidence in the company to induce her into signing the contract
so that she would continue to work for the company without being afforded protections
and benefits that she was entitled to until such time the company was able to recover
from their recent legal woes and with the intention of creating exclusivity with DR such
that she was unable to seek out other opportunities or sources of revenue or employ in her
chosen field.

20.     LIFELOCK took knowing deceptive actions that actually made DR
believe that it was LIFELOCK's decision to make with regard to her entitlement to
employee benefits and protections from overtime work without compensation.

21.     LIFELOCK provided DR with her first set of business cards in early 2008,
which stated, "Denise Richardson, Business Development".

22.     The 2008 agreement was the first written agreement as opposed to the
2006 and 2007 years which included all oral/email terms. The 2008 and 2009 agreements
were simple one page agreements with minimal terms and made no express mention of
DR being considered an independent contractor.   The 2008 and 2009 agreements
contained exclusivity clauses.   DR's compensation in for 2009 was $4,500 per month.
See Exhibits "B" and "E".

23.      In 2010, following the passing of several new laws and reclassification
initiatives aimed at preventing companies from misclassifying employees as independent
contractors, LIFELOCK began to provide much more detail in its agreements, including,

but not limited to, express waivers of benefits, and other unilateral and one-sided provisions which significantly favored LIFELOCK to the detriment of its employees, including DR.  <u>See</u> Exhibits "F" and "G"[1].

24.    In 2011, DR, in an effort to confirm that her paycheck and agreement would not be pushed off until the last minute as in past years, she contacted LIFELOCK's senior management to remind them that it was a stressful time of year and attempting   to activate the renewal process earlier. LIFELOCK's senior management responded, "Let me stop the worrying now, of course you will stay part of the family. You are a valuable member of what we do and who we are, and I couldn't imagine going through another year without you :)".

25.    LIFELOCK , about 10 days later, on December 21, sent DR an email concerning the status of her Agreement, stating:  "Merry Christmas to you!! I hope you know that I am working closely with our Legal Team to push this extension through ASAP. Enjoy the holidays and know that we are here to do what is right - ALWAYS!!" <u>See</u> Exhibit "H"

26.     DR received the Agreement several days later attached to an email that simply said: "Here is the 2011 contract for your review. I don't mean to rush you at all but if you can sign and return today, we can get a check cut tomorrow. If not, check will not be cut until January. This contract is simply an extension from 2010, no changes were made." <u>See</u> Exhibit "I".

27.    LIFELOCK again purposely gained unfair advantage by knowingly presenting the Agreement late in order to induce DR to sign it without offering any valid

---

[1] Exhibit "F" is an email from Tami Nealy for LIFELOCK attaching a draft of the 2010 contract and explaining the reason for the expanded terms as being due to their legal team's involvement.  Exhibit "G" is an email from Tami Nealy for LIFELOCK to DR attaching the fully executed 2010 contract.

explanation for lateness or for the terms unilaterally set by LIFELOCK, or the intent of the new multi-page contract that was used in 2010 or 2011.

28.     Throughout her term of employment with LIFELOCK, DR was consistently lured into a state of trust based on representations from many top executives at LIFELOCK, including TD.

29.     DR was promised the opportunity to grow with the company and that she would be entitled to benefits, bonuses and rewards for her dedication as soon as LIFELOCK escaped its multiple battles on the legal front and became better situated financially and she relied on these representations and their repetitive claims and TD's personal and corporate motto proclaiming, "[we] always do what's right".

30.     Each of her employment agreements from 2008 through 2012 contained exclusivity clauses which provided that she could not accept other employment opportunities or accept advertising revenue from potential competitors of LIFELOCK.

31.     Throughout her employment with LIFELOCK, DR was contractually unable to seek or accept work offers or advertising revenue on her blog site, givemebackmycredit.com, from potential competitors of LIFELOCK, which cutoff all other sources of revenue.  This left her without an opportunity to create outside revenue as a blogger, as any true independent contractor would be allowed, according to all state and federal legal definitions, making her further dependent on LIFELOCK.

32.     As mentioned above, DEFENDANTS consistently delayed providing DR with her renewed contracts until just prior to or after the commencement of the term of the new contract so that DR had no time to review, negotiate, question or comment on the contracts.

33.     DEFENDANTS were also aware that DR's sole source of income came from them and that by the time the contracts were sent to her each year, she was in need of her next paycheck for meeting personal obligations and daily expenses such that she was essentially forced to sign the contracts without understanding the terms or protecting her rights and instead relying on DEFENDANTS' promises and representations indicating it was not necessary to worry because after all this time she should know them and trust them since they claimed to always "do what's right".

34.     Throughout her employment with LIFELOCK, DR was misclassified as an "independent contractor", per the terms of her contracts, but was always treated as an employee, felt like an employee, and was often referred to as "a LIFELOCK family member", "LIFELOCK representative", "LIFELOCK Advocate", "LIFELOCK Team Member", "LIFELOCK Education Specialist", as they often changed her title depending on their needs.

35.     The following facts and circumstances establish that DR was an employee as opposed to an independent contractor of LIFELOCK and that LIFELOCK was aware of DR's status as an employee:

    a.  DR was economically dependent upon LIFELOCK;

    b.  LIFELOCK required an exclusivity clause and knew that they were her sole source of income during her employment period;

    c.  LIFELOCK exercised substantial control over the tasks performed by DR;

    d.  DR's tasks were integral to LIFELOCK's business;

e.  LIFELOCK trained and directed DR throughout her employment; See Exhibit "J"[2].

f.  LIFELOCK controlled DR's daily schedule, daily tasks and provided her "talking points" for her tasks;

g.  LIFELOCK provided power point presentations for DR to present on speaking engagements;

h.  LIFELOCK required DR to attend mandatory training sessions;

i.  LIFELOCK paid for DR's travel and travel expenses for business related trips; See Exhibit "K"[3].

j.  LIFELOCK directed DR to attend and participate in telephone conferences, media interviews and many speaking engagements on behalf of LIFELOCK on a regular basis;

k.  LIFELOCK provided DR business cards on two separate occasions which stated, "Denise Richardson, Business Development" and "Denise Richardson, Education Specialist" and each contained the LIFELOCK logo;

l.  DR was provided LIFELOCK marketing materials, business cards, pens, flyers, shirts, Power Point Presentations, training, access to confidential membership info, and other LIFELOCK related marketing materials including, logo for daily use;

---

[2] Exhibit "J" is a sample of training materials received by DR during her employment with LIFELOCK but is not meant to be an all-inclusive representation of the training materials received by DR as she was asked to attend training sessions and was provided training materials on multiple occasions.

[3] Exhibit "K" is not meant to imply that DR's travel for LIFELOCK was limited to this single email which relates to LIFELOCK's travel policy. She traveled and was reimbursed for her travel on a regular basis during her employment.

m. DR was provided LIFELOCK's corporate policies and was expected to abide by same;

n. DR was provided "team member" lists by LIFELOCK and was included on these lists;

o. LIFELOCK made requests for DR to make immediate phone calls, notices for written follow up requests, requests for articles, interviews, appearances and blogs;

p. LIFELOCK directed DR where, when and how to blog, respond or comment on various news articles and blogs concerning identity theft and issues directly associated with LIFELOCK's business, lawsuits, and regulatory problems;

q. LIFELOCK supplied DR with various materials to perform her services including, but not limited to, purchasing her a network server using a LIFELOCK corporate credit card;

r. LIFELOCK regularly relied on DR to be available on a moment's notice as evidenced by the multiple and continuous tasks provided to her by a number of executives and team member employees of LIFELOCK;

s. DR was specifically precluded from working with any potential competitors of LIFELOCK, essentially limiting her to a single employer in her chosen field and required that DR not accept advertising revenue on her blog at givemebackmycredit.com,  other than LIFELOCK banner ads;

t. LIFELOCK chose an attorney and paid for all legal fees for legal services rendered on behalf of DR when she was subpoenaed in litigation involving LIFELOCK.

u.   DR was directed, manipulated and presented in the media and the public eye as being part of the LIFELOCK organization in the same manner as any employee;

v.   DR performed typical employee tasks such as conducting identity theft related media interviews, business development, promoting fraud prevention and education initiatives on behalf of and under the direction of LIFELOCK;

w.  LIFELOCK expected DR to adhere to the same LIFELOCK employment and corporate policies as any other LIFELOCK employee;

x.   LIFELOCK determined DR's Compensation which was deposited monthly in her personal account;

y.   DR and LIFELOCK had a lengthy recurring working relationship that both parties had reason to believe would continue;

z.   LIFELOCK paid DR as a salaried employee on a monthly rate as opposed to on a "per-task basis".

36.    LIFELOCK's misclassification of DR as an independent contractor has greatly benefitted LIFELOCK to DR's financial and professional detriment.

37.    The intentional misclassification of DR's employee status by LIFELOCK allowed LIFELOCK to avoid tax obligations, avoid offering DR access to multiple retirement plans, health care plans, stock options, paid sick leave, paid vacation time, unemployment insurance, worker's compensation insurance and paid overtime as required by Federal labor laws.

38.    DR was unable to seek certain other employment opportunities and passed on others based on her exclusivity agreements with LIFELOCK.  DR actually rejected a

number of opportunities to build relationships with similarly situated companies and advertising offers because of conflicts with LIFELOCK's products and services.

39.    LIFELOCK and TD's misclassification of DR as an independent contractor as opposed to an employee was known and deliberate in furtherance of LIFELOCK's attempt to avoid tax obligations, legal obligations, offering benefits and to create an unfair competitive advantage for itself in the industry of fraud prevention and identity theft protection which placed a burden on interstate commerce and on its competitors.  See Exhibit "L"[4].

40.    DR was forced to enter into and sign employment contracts which referred to her as an independent contractor despite the fact that she was in fact an employee.

41.    DR was told that if she failed to sign employment contracts, she would not be permitted to work for LIFELOCK.

42.    DR was informed that if she failed to agree to the exclusivity clauses, waiver of benefits and other biased clauses in her employment agreements she would not be permitted to work for LIFELOCK or be paid.

43.    Further, DR consistently worked greater than forty (40) hour work weeks under the direction and at the request of her superiors at LIFELOCK, including TD, and received no additional compensation for her overtime labor, being told that one day her loyalty and hard work would be rewarded and that "LIFELOCK is going places and we're taking you with us".

---

[4] Exhibit "L" is a written example of LIFELOCK's knowledge that it had misclassified DR and its knowledge of the federal guidelines for classification of employees. This was not a limited occurrence and this exhibit is attached as a sample to show LIFELOCK's intent and state of mind.  LIFELOCK's statement in this email through Tami Nealy, Senior Director, Corporate Communications, is self serving and false in that LIFELOCK actually directed and controlled how DR would respond to the public and media throughout her employment with LIFELOCK.

44.     Defendant, LIFELOCK has maintained and continues to maintain numerous ERISA retirement and welfare benefit plans throughout the years which are available to persons who are "employees" of LIFELOCK subject to certain qualifying criteria unique to each plan.

45.     Under information and belief, DR qualified for each of LIFELOCK's ERISA plans during her multi-year employment with LIFELOCK but was denied the opportunity of said plans based on her misclassification and LIFELOCK's intentional actions taken to prevent her access.

46.     The various plan materials and information were never provided to DR by LIFELOCK based on her misclassification and misrepresentations by LIFELOCK that DR was not entitled to participate.

47.     DR was not offered benefits during her term of employment with LIFELOCK and was denied access to retirement plans, stock options, healthcare and other employee welfare benefit programs and plans which other properly classified employees were offered and entitled to utilize.  LIFELOCK's denial of benefits to DR continued even after DR made specific requests for inclusion on multiple occasions.

48.     DR has not been able to exhaust all administrative remedies since none are available to her at this time since she has been terminated. DR was never provided the plan materials despite her requests and therefore there were never administrative remedies available for her to exhaust.  Attempting to exhaust any and all administrative remedies would be futile under the circumstances.

49.     Between January 10, 2012, and February 1, 2012, LIFELOCK informed DR and DR relied on its representations, that her yearly employment contract would be renewed for an eighteen month term of January 1, 2012 through June 30, 2013.

DEFENDANTS sent her a contract to sign in which she would be paid an increased salary of $6,000 per month for an increased eighteen month term.  This was a departure from the typical twelve month contracts that had been used in the past as insisted on by DR and agreed by LIFELOCK in order to avoid her being in the position she had been placed in by LIFELOCK during the holiday seasons again. DR received her first direct deposit of the 2012 year from LIFELOCK in early January.  See Exhibits "M", "N" and "O".

50.     LIFELOCK admitted to DR that it was its delay in getting the contract together earlier and promised this would now be a top priority and there was no need to worry as they always do things right and senior management had promised they would do everything necessary to complete the additional details of the agreement and make things right.

51.     DR executed the contract on or about February 15, 2012.   The approximate one month delay was due to DEFENDANTS defining and revising her contractual tasks which were finalized on February 14, 2012.  See Exhibit "P".

52.     Thereafter, DEFENDANTS directed DR to perform certain tasks and DR proceeded with her typical work schedule and routine.  She performed all tasks ordered and directed by her employers and her employers accepted and benefited from the work product generated by DR.

53.     Around this time, DR began to question DEFENDANTS about employee benefits for 2012 and beyond that she felt she was entitled to based on their many promises and based on her knowledge that other employees were entitled to welfare and benefit plans and stock options offered by DEFENDANTS.  DR inquired if her benefit package could now be included in the 2012 contract.

54.     DEFENDANTS then changed their position and terminated DR in late February 2012 after unilaterally inserting a termination provision in her previously executed contract which DR signed based on LIFELOCK's representation to her that she would only be paid if she signed immediately.  See Exhibit "Q"[5].

55.     DR has been caused significant distress and losses financially, emotionally, professionally, and physically by the longstanding knowing and intentional actions of DEFENDANTS.   DR's entire career has been set back many years by LIFELOCK's deceptive acts and outrageous conduct toward her.   She is emotionally distraught and has suffered and continues to suffer immensely based on her history with LIFELOCK.

56.     She has had to retain the undersigned attorneys to represent her interests in this action and has agreed to pay for their reasonable fees and costs.

## COUNT I – Violations of ERISA Fiduciary Duties
## (LifeLock)

57.     Paragraphs 1-56 above, including all subparagraphs, are fully incorporated herein.

58.     At all pertinent times, LIFELOCK acted as either the statutory administrator, named fiduciary or fiduciary of LIFELOCK's pension and employee welfare benefit plans.  In these capacities, the conduct of LIFELOCK was governed by the strict fiduciary duties of Section 404(a) of ERISA, 29 U.S.C. § 1104(a).  These fiduciary duties include, but are not limited to, the duty to act solely in the interest of plan

---

[5] Exhibit "Q" purports to show LIFELOCK's unilateral insertion of the termination provision into the previously signed contract.  DR was terminated orally several days later by DEFENDANTS based on the termination provision which they unilaterally inserted.

participants and beneficiaries, to act with utmost loyalty to them, to administer the plans in accordance with the written plan documents, to disclose truthful information about the plans and to identify and enroll all persons who are identified to participate in each plan.

59. LIFELOCK violated its strict ERISA fiduciary duties on a continuing basis by, among other things:

    a. Failing to review the facts applicable to the entitlement of DR under the pension and employee welfare benefit plans and to correct or prevent the exclusion of DR from the plans;

    b. Failing to distribute to DR documents relating to the pension and employee welfare benefit plans which DR was entitled to receive under ERISA and by otherwise misleading, and concealing from DR facts showing DR was entitled to participate;

    c. Making misrepresentations to DR who was classified as an independent contractor that she was not entitled to participate in the pension and employee welfare benefit plans when in fact she was entitled to participate.

60. LIFELOCK's intentional and wrongful conduct harmed DR and therefore LIFELOCK committed a continuing violation of ERISA §404(a), 29 U.S.C. § 1104(a).

61. DR seeks all equitable relief available to her pursuant to ERISA, 29 U.S.C. 1132(a)(3).

62. DR seeks to recover attorneys' fees and costs pursuant to ERISA, 29 U.S.C. §1132(g).

63.     DR seeks to recover the statutory penalty of $100 per day pursuant to ERISA, 29 U.S.C. § 1132(c)(3), based on LIFELOCK's failure to distribute plan materials as required by ERISA.

**WHEREFORE**, Plaintiff, Denise Richardson, demands judgment in her favor and against LifeLock, Inc., for equitable relief stemming from the breaches of fiduciary duties, statutory penalties stemming from same, and pre-judgment interest and reasonable costs, attorneys' fees and the costs of this litigation, and for any further relief deemed just and proper.

## COUNT II – Unlawful Interference With Attainment of ERISA Benefits (LifeLock)

64.     Paragraphs 1-56 above, including all subparagraphs, are fully incorporated herein.

65.     Under the terms of LIFELOCK'S pension and employee welfare benefit plans, DR was entitled to be a participant.

66.     DR is within the class of protected persons as defined by ERISA since she is a "participant".

67.     By reason of the intentional and wrongful conduct, LIFELOCK on a continuing basis took specific actions to discriminate against DR for the purpose of interfering with her right to attain and participate in and receive benefits under the respective plans.

68.     LIFELOCK acted with specific intent to interfere with DR's right to plan participation and benefits.

69.     LIFELOCK thereby committed a continuing violation of ERISA § 510, 29 U.S.C. § 1140 and is liable for all losses that this continuing violation caused to DR.

18

70.     DR is seeking attorneys fees and costs pursuant to ERISA §510, 29 U.S.C. §1132(g).

**WHEREFORE**, Plaintiff, Denise Richardson, demands judgment in her favor and against LifeLock, Inc., for all damages that she has suffered resulting from LifeLock, Inc.'s ERISA violations, plus pre-judgment interest and reasonable costs, attorneys' fees and the costs of this litigation, and for any further relief deemed just and proper.

### COUNT III – ERISA Retaliation Claim
### (LifeLock)

71.     Paragraphs 1-56 above, including all subparagraphs, are fully incorporated herein.

72.     Under the terms of LIFELOCK'S pension and employee welfare benefit plans, DR, as an employee, was entitled to be a participant.

73.     DR is within the class of protected persons as defined by ERISA since she is a "participant".

74.     DR's questioning of LIFELOCK regarding her misclassification and her entitlement to benefits as an employee is a protected act under ERISA.

75.     LIFELOCK was aware at all times that DR's act of questioning LIFELOCK regarding her misclassification and her entitlement to benefits as an employee is a protected act under ERISA.

76.     LIFELOCK took adverse employment actions against DR by firing her and terminating her executed employment agreement following her request for benefits.

77.     LIFELOCK took these adverse employment actions in retaliation for DR exercising her rights as an employee as defined by LIFELOCK's ERISA plans.

78.     LIFELOCK thereby violated ERISA § 510, 29 U.S.C. § 1140 and is liable for all losses caused to DR.

79.     DR is seeking to recover attorneys' fees pursuant to ERISA §510, 29 U.S.C. §1132(g).

**WHEREFORE**, Plaintiff, Denise Richardson, demands judgment in her favor and against LifeLock, Inc., for all damages that she has suffered resulting from LifeLock, Inc.'s ERISA violations, plus pre-judgment interest and reasonable costs, attorneys' fees and the costs of this litigation, and for any further relief deemed just and proper.

## COUNT IV – Unlawful Misclassification and denial of ERISA Benefits (LifeLock)

80.     Paragraphs 1-56 above, including all subparagraphs, are fully incorporated herein.

81.     Under the terms of LIFELOCK'S pension and employee welfare benefit plans, DR was entitled to be a participant.

82.     DR is within the class of protected persons as defined by ERISA since she is a "participant".

83.     By reason of the intentional and wrongful conduct, LIFELOCK on a continuing basis took specific actions to discriminate against DR for the purpose of interfering with her right to attain and participate in and receive benefits under the respective plans.

84.     LIFELOCK intentionally and knowingly misclassified DR as an independent contractor in order to cause her to be ineligible for participation in LIFELOCK's ERISA plans.

85.     LIFELOCK acted with specific intent to interfere with DR's right to plan participation and benefits.

86.     DR seeks relief pursuant to ERISA §510, 29 U.S.C. § 1132(a)(1)(B), and seeks all benefits that she is and was entitled to under LIFELOCK's several ERISA plans.

87.     DR is seeking attorneys fees and costs pursuant to ERISA §510, 29 U.S.C. §1132(g).

**WHEREFORE**, Plaintiff, Denise Richardson, demands judgment in her favor and against LifeLock, Inc., for all damages that she has suffered resulting from LifeLock, Inc.'s ERISA violations, plus pre-judgment interest and reasonable costs, attorneys' fees and the costs of this litigation, and for any further relief deemed just and proper.

## COUNT V – Conditional Claim For Retroactive Benefits Under ERISA Plans (LifeLock)

88.     Paragraphs 1-56 above, including all subparagraphs, are fully incorporated herein.

89.     This conditional count is pled pursuant to Fed.R.Civ.P. 8(e)(2).   DR asserts and pursues this conditional count only if the Court determines that DR is entitled to obtain benefits under LIFELOCK's pension and employee welfare benefit plans.

90.     LIFELOCK's pension and employee welfare benefit plans are arrangements governed by ERISA.

91.     As a result of her employment with LIFELOCK, DR was eligible to receive benefits from LIFELOCK's retirement plan, and welfare benefit plan.

92.     LIFELOCK's intentional and wrongful misclassification of DR as an independent contractor had the effect of denying DR benefits to which she was otherwise have been entitled to under the respective plans.

93.     LIFELOCK uniformly but wrongfully informed DR that she was not eligible to receive benefits from the plans and, in doing so, LIFELOCK violated its duty as administrator and fiduciary of the plans.

94.     LIFELOCK never allowed DR to apply for benefits under the plans and the plans do not provide to misclassified independent contractors any administrative procedures for challenging the denial of benefits under the plans.

95.     Any attempt by DR to obtain relief by recourse of administrative procedures was futile, as demonstrated by LIFELOCK's continuing practice of excluding DR from participation throughout her employment.

96.     If it is found that DR was entitled to recover actual benefits under these plans in which she never became a participant due to her misclassification, then pursuant to §502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B), DR is entitled to payment of all back benefits that were intentionally and wrongfully denied to her.

**WHEREFORE**, Plaintiff, Denise Richardson, demands judgment in her favor and against LifeLock, Inc., for all damages that she has suffered resulting from LifeLock, Inc.'s ERISA violations, plus pre-judgment interest and reasonable costs, attorneys' fees and the costs of this litigation, and for any further relief deemed just and proper.

## Count VI – Failure to Pay Overtime in Violation of the FLSA
### (LifeLock)

97.     Paragraphs 1-56 above, including all subparagraphs, are fully incorporated herein.

98.     The FLSA, 29 U.S.C. § 207(a)(2) provides in relevant part:

"no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate of not less than one and one-half times the regular rate at which he is employee".

99.     DR was willfully and intentionally misclassified by LIFELOCK as an independent contractor rather than an employee in order for LIFELOCK to avoid tax obligations and to avoid paying DR overtime wages for workweeks in excess of forty hours, benefits and other compensation that DR would have been entitled to as a regular employee.

100.    By the acts and omissions complained of above, including, inter alia, by failing to pay overtime wages for work in excess of forty hours per week, LIFELOCK violated the FLSA.

101.    DR is entitled to be paid at the defined overtime rate for all hours in excess of forty hours per work week during her employment at LIFELOCK.

102.    LIFELOCK's violations of the FLSA were willful and accordingly, a three year statute of limitations applies, pursuant to 29 U.S.C. § 255.

103.    LIFELOCK has intentionally, willfully and repeatedly engaged in a pattern, practice or policy of violating the FLSA.

104.    DR has been harmed and has suffered damages by being denied overtime pay in accordance with the FLSA, plus incurred costs and attorneys' fees.

105.    As a result of LIFELOCK's unlawful acts and violations of the FLSA, DR has been damaged and pursuant to 29 U.S.C. § 216(b) is entitled to recover overtime wages, liquidated damages in an amount equal to the wages she is owed as unpaid overtime, prejudgment interest, attorneys' fees and costs.

**WHEREFORE**, Plaintiff, Denise Richardson, demands judgment in her favor and against LifeLock, Inc., for all damages that she has suffered resulting from LifeLock, Inc.'s FLSA violations, plus pre-judgment interest and reasonable costs, liquidated damages, attorneys' fees and the costs of this litigation, and for any further relief deemed just and proper.

### Count VII – Breach of Employment Contract
### (LifeLock)

106.    Paragraphs 1-56 above, including all subparagraphs, are fully incorporated herein.

107.    LIFELOCK and DR entered into a written contract for employment on or about January 1, 2012.

108.    LIFELOCK and DR began to perform pursuant to the contract after its execution.

109.    LIFELOCK wrongfully terminated the contract thereby breaching the terms of the agreement in February 2012.

110.    DR has been damaged by the wrongful termination and by LIFELOCK's breach of the written employment contract.

**WHEREFORE**, Plaintiff, Denise Richardson, demands judgment in her favor and against LifeLock, Inc., for all damages that she has suffered resulting from LifeLock,

Inc.'s breach, plus pre-judgment interest and reasonable costs, attorneys' fees and the costs of this litigation, and for any further relief deemed just and proper.

## Count VIII – Unjust Enrichment
### (LifeLock)

111.    Paragraphs 1-56 above, including all subparagraphs, are fully incorporated herein.

112.    Throughout the four plus years of DR's employment with LIFELOCK, DR conferred multiple benefits upon LIFELOCK including loyal services and employment and served as the public spokesperson for LIFELOCK throughout periods of negative publicity that LIFELOCK was facing through DR's term of employment.

113.    LIFELOCK had express knowledge of the services rendered by DR and knowingly and willingly accepted and retained the benefits that resulted from DR's work.

114.    In fact, LIFELOCK had requested, directed and controlled many of the actions taken by DR which led to the benefits enjoyed by LIFELOCK.

115.    LIFELOCK intentionally and willfully misclassified DR as an independent contractor throughout her term of employment.

116.    LIFELOCK was benefitted in multiple ways by DR's services and misclassification, including enjoying a preserved public image, being seen by the public in a positive light through times of adversity, avoiding tax obligations that would have been incurred had DR been properly classified, avoiding providing benefits such as pension plans, stock options and welfare health plans to DR during her employment, and other benefits that will become known through the course of discovery.

117.    The circumstances are such that it would be wholly inequitable for LIFELOCK to retain such benefits without paying for them.

**WHEREFORE**, Plaintiff, Denise Richardson, demands judgment in her favor and against LifeLock, Inc., for equitable relief, and for any further relief deemed just and proper.

### Count IX – Fraud and Punitive Damages
### (LifeLock)

118.   Paragraphs 1-56 above, including all subparagraphs, are fully incorporated herein.

119.   LIFELOCK made the following false statements concerning material facts:

    a.   LIFELOCK promised to DR on multiple occasions that once it was in a better financial position, DR would be rewarded;

    b.   LIFELOCK promised to DR on multiple occasions that if DR stayed with LIFELOCK through their "tough times" with regulatory problems and lawsuits that she would be rewarded in the future;

    c.   In November of 2009, after LIFELOCK had settled a lawsuit with Experian, LIFELOCK provided DR a renewed employment contract for the 2010 calendar year which contained additional provisions that strongly favored LIFELOCK and were detrimental to DR.  The contract was sent to DR during the December holidays and LIFELOCK informed DR that they could talk through any concerns, and intentionally played down their knowing intent behind the drafting of the agreement, required that DR sign immediately and return the contract to LIFELOCK if she wanted to get paid otherwise she would not be paid until sometime in January.  When DR questioned LIFELOCK as to how they expected her to find a lawyer during the holidays to review the contract LIFELOCK responded to DR

that she should know by now that she can trust LIFELOCK and again reminded her they "always do what's right" .

    d.   In December of 2011, a similar situation occurred in which DR was rushed into signing a renewed employment contract on short notice during the holiday period.  LIFELOCK once again responded that they were sorry to rush her, but if wanted to be paid, she needed to trust them and sign immediately and again reassuring her not to worry, "they always do what's right"

120.    LIFELOCK had full knowledge when it made these statements that the statements were deceptive, false and selfishly motivated with reckless disregard for DR's rights and LIFELOCK's regulatory and legal obligations.

121.    LIFELOCK had specific intent at the time it made its promises to not perform.

122.    LIFELOCK's intent when it made these false statements was to induce DR to continue her loyal employment to LIFELOCK without exercising her legal rights or seeking additional compensation.

123.    DR relied on LIFELOCK's false statements for several years without receiving any additional rewards for her loyal services until she was wrongfully terminated in February 2012.

124.    DR rejected or passed on multiple offers from competitors during her years with LIFELOCK, rejected or passed on multiple advertising opportunities on her websites during her time with LIFELOCK and was prevented from building up her advertising revenue from other sources, working toward becoming financially independent, creating a secure future for herself and growing retirement accounts with

another company which she was assured would be available to her if she stayed with LIFELOCK.

125.   DR is seeking punitive damages based on LIFELOCK's specific intent to defraud DR as evidenced by the steady stream of false promises made by LIFELOCK for the purpose of inducing detrimental reliance from DR to the benefit of LIFELOCK.

**WHEREFORE**, Plaintiff, Denise Richardson, demands judgment in her favor and against LifeLock, Inc., for all damages that she has suffered resulting from LifeLock, Inc.'s fraud, plus pre-judgment interest and reasonable costs, attorneys' fees, punitive damages, and the costs of this litigation, and for any further relief deemed just and proper.

## Count X – Intentional Infliction of Emotional Distress
## (LifeLock)

126.   Paragraphs 1-56 above, including all subparagraphs, are fully incorporated herein.

127.   Throughout the multi-year employment of DR by LIFELOCK, LIFELOCK's conduct was often intentionally reckless and disregarded the distress, emotional pain and anguish and suffering that DR was put through on a yearly basis when it came time to renew her contract for employment.

128.   LIFELOCK's conduct was outrageous, beyond all bounds of decency, atrocious and utterly intolerable in a civilized community.

129.   LIFELOCK's despicable conduct was magnified by its consistently false promises and representations that DR should trust LIFELOCK and that LIFELOCK always "did the right thing" with regard to its valued employees such as DR.

130.   LIFELOCK's conduct is further magnified by the fact that it is in the business of consumer protection, fraud prevention and identity theft protection.  Based on LIFELOCK's role in the community and on its constant reminders and promises to DR that she should trust them since she was a LIFELOCK team member and was part of the LIFELOCK family, it was beyond all bounds of decency for LIFELOCK to deceive DR and cause her such distress throughout her employment and then to terminate her wrongfully.

131.   LIFELOCK's conduct lured DR into a reasonable state of trust.

132.   LIFELOCK made the following false statements, promises and/or actions toward DR during her employment:

a.   In November of 2009, after LIFELOCK had settled a lawsuit with Experian, LIFELOCK provided DR a renewed employment contract for the 2010 calendar year which contained additional provisions that strongly favored LIFELOCK and were detrimental to DR.  The contract was sent to DR during the December holidays and LIFELOCK informed DR that they could talk through any concerns, and intentionally played down their knowing intent behind the drafting of the agreement, required that DR sign immediately and return the contract to LIFELOCK if she wanted to get paid otherwise she would not be paid until sometime in January.  When DR questioned LIFELOCK as to how they expected her to find a lawyer during the holidays to review the contract LIFELOCK responded to DR that she should know by now that she can trust LIFELOCK and again reminded her they "always do what's right".

    b.  In December of 2011, a similar situation occurred in which DR was rushed into signing a renewed employment contract on short notice during the holiday period.  LIFELOCK once again responded that they were sorry to rush her, but if she wanted to be paid, she needed to trust them and sign immediately and again reassuring her not to worry, "they always do what's right"

133.    The result of LIFELOCK's outrageous conduct was that DR was unable to protect her rights by having an attorney review her contracts, negotiate the terms of same, and protect herself from the biased one-sided terms included in the contracts by LIFELOCK and which improperly labeled her as an independent contractor and denied her of the legal protections that she was entitled to as an employee.

134.    LIFELOCK knew or should have known when it deceived DR and made false statements to her in order to gain her trust and prevent her from protecting her rights that emotional distress was likely to result.

135.    LIFELOCK's actions and conduct have caused DR severe emotional distress, and losses financially, emotionally, professionally, and physically by the longstanding knowing and intentional actions of LIFELOCK.

**WHEREFORE**, Plaintiff, Denise Richardson, demands judgment in her favor and against LifeLock, Inc., for all damages that she has suffered resulting from LifeLock, Inc.'s intentional infliction of emotional distress, plus pre-judgment interest and reasonable costs, attorneys' fees, punitive damages, and the costs of this litigation, and for any further relief deemed just and proper.

**COUNT XI – ERISA Retaliation Claim**
**(Todd Davis)**

136. Paragraphs 1-56 above, including all subparagraphs, are fully incorporated herein.

137. Under the terms of LIFELOCK'S pension and employee welfare benefit plans, DR was entitled to be a participant.

138. TD, as the CEO of LIFELOCK, and as DR's statutory employer, had the right to independently determine whether to continue to employ DR or to terminate her employment.

139. TD, as the CEO of LIFELOCK, and as DR's statutory employer, had the capability and means to provide access to all ERISA employee benefit and welfare plans to employees, including DR.

140. DR's questioning of TD and LIFELOCK regarding her misclassification and her entitlement to benefits as an employee is a protected act under ERISA.

141. TD was aware at all times that DR's act of questioning TD and LIFELOCK regarding her misclassification and her entitlement to benefits as an employee is a protected act under ERISA. TD personally made the same promises and representations to DR and her fiancé in her home in Florida in early February 2008.

142. TD decided to take adverse employment actions against DR by firing her and terminating her executed employment agreement following her request for benefits.

143. TD took these adverse employment actions in retaliation for DR exercising her rights as an employee.

144. TD violated ERISA § 510, 29 U.S.C. § 1140 and is liable for all losses caused to DR.

145. DR is seeking to recover attorneys' fees and costs pursuant to ERISA §510, 29 U.S.C. §1132(g).

**WHEREFORE**, Plaintiff, Denise Richardson, demands judgment in her favor and against Todd Davis, for all damages that she has suffered resulting from Todd Davis's ERISA violations, plus pre-judgment interest and reasonable costs, attorneys' fees and the costs of this litigation, and for any further relief deemed just and proper.

## JURY DEMAND

The Plaintiff hereby demands a trial by jury for all causes of action so triable in this lawsuit.

Dated: September 25, 2012

DANIELS KASHTAN DOWNS ROBERTSON & McGIRNEY
*Attorneys for Denise Richardson*
3300 Ponce De Leon Boulevard
Coral Gables, Florida   33134
Telephone No.: (305)   448-7988
Facsimile No.:  (305)   448-7978


By: /s/Lorne E. Berkely
    Lorne E. Berkeley, Esq.
    Fla. Bar No.: 146099
    Jordan C. Kay, Esq.
    Fla. Bar No.: 56123

p:\edsiss\docs\1630\7172\gu3206.docx